IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SARAH MARIE POKRIFKA,                    :
                          Plaintiff      :
                                         :
     v.                                  :          3:CV-06-1759
                                         :          (JUDGE VANASKIE)
DOLLAR GENERAL CORPORATION,              :
                          Defendant      :

MEMORANDUM

Plaintiff Sarah Marie Pokrifka brings this action against Defendant Dolgencorp, Inc. ("Dollar General"), on allegations that she was discharged based on her gender and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. State. § 951, et seq., and Pennsylvania common law. (Compl., Dkt. Entry 1.) She also alleges she was retaliated against for making a claim for Workers' Compensation benefits and for providing testimony in a third-party personal injury lawsuit against Dollar General.

Dollar General has filed a Motion for Summary Judgment with respect to all of Ms. Pokrifka's claims. (Dkt. Entry 25.) Dollar General has also filed a Motion to Strike the testimony of Dr. Joseph Michael from the summary judgment record. (Dkt. Entry 30.) For the reasons stated below, Dollar General's Motion for Summary Judgment will be granted and its Motion to Strike will be denied.

I.  BACKGROUND

Dolgencorp operates discount retail stores throughout the country under the name Dollar General.  (Booth Decl., Dkt. Entry 28, at ¶ 3.)  Ms. Pokrifka began working at Dollar General as a clerk in September 1998.[1]  (Def.'s Statement of Material Facts ("SMF"), Dkt. Entry 27, ¶ 6.)  In November of 1998, she was promoted to a third key holder position.  (Def.'s SMF, ¶ 7.)  Shortly thereafter, she was promoted to Assistant Store Manager, and in April of 1999, she was promoted to store manager.  (Def.'s SMF, ¶¶ 8 & 9.)  The store manager is the highest ranking on-site employee and is responsible for, among other things, running the store's day-to-day operations.  (Booth Decl., Dkt. Entry 28, at ¶ 3.)  The store manager reports to the district manager.  (Id.)

According to Dollar General's job description, a store manager is "responsible for the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (Job Description, Dkt. Entry 29-3.)  This includes frequent walking, standing, bending, stooping, kneeling, and unloading of trucks.  (Id. at 2.)  Occasional climbing and lifting of up to 55

_____

[1]Defendant complied with Local Rule of Court 56.1 by submitting in numbered paragraphs statements of fact contended to be undisputed and supported by citation to the summary judgment record.  (Defendant's Statement of Undisputed Material Facts ("SMF"), Dkt. Entry 27.)  Plaintiffs have stipulated to the majority of the facts.  (See Plaintiff's Counter Statement of Material Facts ("CSMF"), Dkt. Entry 34.)  Reference to Defendant's Statement signifies that the fact is admitted and not in dispute.

pounds, and frequent lifting of up to 40 pounds, are also included in the description. (Id.) Ms. Pokrifka claims that she was never told about these requirements before accepting the general manager position. She testified: "I was never told I had to lift any amount of weight to be a manager. I was never told that–even though I weigh 180 pounds, I should be able to lift 40." (Pokrifka Dep., Dkt. Entry 29-2, at 18.)[2]

In August of 2000, Ms. Pokrifka transferred stores. (Def.'s SMF, ¶ 11.) Within ten days of transferring stores, a customer slipped and fell in the store, and later filed a personal injury lawsuit against Dollar General. (Def.'s SMF, ¶ 12.) The next year, in 2001, Ms. Pokrifka was deposed in connection with the third-party personal injury suit. (Def.'s SMF, ¶ 13.) She did not, however, testify at the trial in 2003. (Def.'s SMF, ¶ 14.)

At the time when Ms. Pokrifka served as store manager, Robert Booth was the district manager to whom she reported. (Booth Decl., Dkt. Entry 28, at ¶ 4.) Mr. Booth claims he had no knowledge that Ms. Pokrifka testified in the third-party personal injury suit. (Id. at ¶ 9.) Ms. Pokrifka testified that she did not know whether Mr. Booth knew she was testifying in the personal injury suit or not. (Pokrifka Dep., Dkt. Entry 29-2, at 82.)

On April 3, 2000, Ms. Pokrifka sustained a workplace injury to her lower back. (Def.'s

---

[2]For convenience, except for documents with numbered paragraphs, references to the summary judgment record will be to the document number and pagination generated by the electronic case filing system ("CM/ECF") listed at the top of each page of the documents filed by the parties, rather than to the exhibit number or deposition transcript used by the parties.

SMF, ¶ 16.)  Later that year, on December 12, 2000, Ms. Pokrifka sustained another workplace

injury while wrapping Christmas presents.  (Def.'s SMF, ¶ 18; Dkt. Entry 29-7.)  On March 30,

2002, while unloading soda, Ms. Pokrifka sustained a third workplace injury, and felt discomfort

in her lower back.  (Def.'s SMF, ¶ 19; Dkt. Entry 29-7, at 2.)  Finally, on April 15, 2002, while in

the stock room, she sustained an injury resulting in immediate pain to her lower back.[3]  (Def.'s

SMF, ¶ 20.)  Medical treatment for all four of her injuries was covered by Workers'

Compensation.  (Def.'s SMF, ¶¶ 17-20.)

     The same day as her injury, Dr. Joseph Michael examined her.  (Michael Report, Dkt.

Entry 33, at 19.)  He found that her "thoracic spine showed tenderness upon palpation of the

first through the twelfth spinal processes.  Examination and palpation of the thoracic spine

musculature revealed deep and superficial muscle spasms bilaterally . . . Motion palpation

testing was positive for severe restrictions in the thoracic spine."  (Id. at 20.)  He also found

"severe restrictions at the lumbar spine, as well as the right and left sacroiliac joints."  (Id.)  An

MRI of the thoracic spine in April of 2002 showed some thoracic disc degeneration and a

lumbar MRI showed a disc herniation at L3-4 and a protruding disc at L4-5.  (Dkt. Entry 29-7, at

2.)

     Ms. Pokrifka saw Dr. John A. Kline, Jr. in September of 2002 for pain management.

---

[3]Ms. Pokrifka claims she went to Dr. Robert Bechter on April 15, 2002, for treatment of
her injury, and that he restricted her from lifting any objects.  (Br. Opp'n Mot. Summ. J., Dkt.
Entry 33, at 6.)  Dr. Bechter's report, however, is not included in the record.

4

(Kline Letter, Dkt. Entry 33, at 16.)  He noted that she was being treated by a chiropractor and continued to work full-time.  (Id.)  The chiropractic services were helpful and allowed Ms. Pokrifka to manage her work tasks.  (Id.)  A clinical examination revealed "tenderness at the L4-5, S1 spinous processes, and the left paraspinal musculature, once again particularly over the sacroiliac region.  She had continued tenderness overly the sciatic notch. . . ."  (Id. at 17.)  Dr. Kline prescribed physical therapy and medication.  (Id.)

Dr. Kline saw Ms. Pokrifka again on November 20, 2002.  (Kline Letter, Dkt. Entry 33, at 17.)  Ms. Pokrifka stated she felt numbness and tingling at times, and continued back pain.  (Id.)  She continued to work full-time, and the pain was less during the initial 40 or 50 hours of the week, but increased substantially with the last 40 hours.  (Id.)  She had continued tenderness in her lower back.  (Id.)  Dr. Kline instructed her to continue with a home exercise program and proscribed Utracet in addition to Bextra.  (Id.)

On January 8, 2003, Ms. Pokrifka underwent a Functional Capacity Evaluation conducted by Dr. Kline.  (Dkt Entry 29-6.)  He found she "is minimally capable of performing functional activities at the light-medium physical demand level."  (Id.)  During the examination, he observed "evidence of high symptom exaggeration and voluntary submaximal effort suggesting that Ms. Pokrifka may actually indeed be capable of performing a higher degree of material handling than demonstrated [ ]."  (Id.)  He further observed that it is more likely that she would be capable of performing at a higher physical demand level had a more consistent

effort been put forth and that this observation should be "strongly considered" in a job analysis or physical capacity evaluation.  (Id.)

On March 24, 2003, Dr. Kline again examined Ms. Pokrifka.  (Dkt. Entry 29-5, at 1.)  He found that she could sit, stand, or walk for six to eight hours.  (Id.)  He found she could lift from 21 to 30 pounds and could occasionally bend, reach, climb, squat, rotate, twist, and kneel.  (Id.)  He concluded that she should be limited to working fifty hours per week.  (Id.)  Ms. Pokrifka saw Dr. Kline for a follow up visit on April 24, 2003, and demonstrated a palpable muscle spasm in the right lumbosacral paraspinals as well as a mild tenderness overlying the left sacroiliac region.  (Kline Letter, Dkt. Entry 33, at 17.)  He continued to restrict her to working 50 hours per week.  (Id.)

On November 5, 2003, Ms. Pokrifka saw Dr. William H. Prebola for a physiatric independent medical evaluation.  (Dkt. Entry 29-7, at 1.)  In a Physical Capacities Assessment Form, he noted that she could sit eight hours, stand seven hours, walk six hours, and drive six hours.  (Id. at 9.)  It was also noted that she could lift and carry 35-45 pounds occasionally, and occasionally push or pull 75 pounds.  (Id.)  He concluded that she "may return to gainful employment with medium duty work restrictions.  She should have minimum lifting of 55-60 pounds occasionally and not repetitive lifting greater than 35-40 pounds frequently.  She needs to avoid continuous lumbar bending and twisting activities . . . . She may work full time, even with overtime hours, with the above physical capacities."  (Id. at 7.)  He further observed that

she had multiple subjective pain complaints that were clearly outside of her clinical objective findings and the clinical diagnostic studies.  (Id.)

In a letter to Ms. Pokrifka's attorney dated July 25, 2008, Dr. Michael commented on Ms. Pokrifka's injuries: "The injuries sustained to the spine are subject to exacerbations and [have] become chronic in nature, and in all probability will cause pain, while this patient performs ordinary functions, such as lifting, bending, or prolonged sitting." (Michael Report, Dkt. Entry 33, at 22.)  He concluded: "[T]his injury will result in a permanent reduction in the normal range of motion of the regions of the neuro-musculoskeletal system of the patient and there is a reasonable medical probability that this patient will require further care in the future to remedy the symptoms from these injuries."  (Id.)  Dr. Kline also wrote a letter to Ms. Pokrifka's attorney in which he opined that her restriction of lifting or carrying up to a maximum of 30 pounds was more probably than not permanent in nature.  (Id. at 18.)

Ms. Pokrifka testified that she had difficulty lifting, working long hours, standing at the register, and unloading the truck.   She stated she was simply exhausted.  (Pokrifka Dep., at 68-69.) She claims she could not perform her duties without an assistant manager, which she requested.  (Pokrifka Dep., Dkt. Entry 29-2, at 69.)  Ms. Pokrifka states she has difficulty sleeping, cannot ride amusement park rides, cannot roughhouse with her nephew, and cannot walk for longer than 45 minutes or stand for more than 20 minutes.  (Id. at 36-44.)  She testified to a "bad sleeping arrangement."  (Id. at 37.)  She stated: "I toss and turn.  I'm up. My arms are

numb. My legs are numb. My back is sore. Sometimes it's like to a point where it feels back and blue . . . My sleeping is no good." (Id. at 38.) She testified she generally goes to bed between 11:00 and 11:30, and wakes up at 6:45. (Id.) She said she sleeps five to six hours a night. (Id.) During the day, she takes a nap for an hour, or an hour and a half. (Id.) She mentioned her sleep problems to a chiropractor, but no one else. (Id. at 39-40.)

She also said she has difficulty bending, stooping and turning. (Def.'s SMF, at ¶ 25.) According to her deposition, however, Ms. Pokrifka does have the ability to fold laundry, wash dishes, dust, shop for groceries, ascend a flight of stairs, and perform leg lifts. (Pokrifka Dep., Dkt. Entry 29-2, at 2-4.)

In May of 2003, Bonnie Bolton, the assistant store manager for Ms. Pokrifka, took medical leave. (Def.'s SMF, at ¶ 29.) In late July of 2003, Ms. Pokrifka hired Sally Vega-Penarete as an Assistant Store Manager. (Def.'s SMF, at ¶ 30.) That same month, Dale Swire, a Manger for Dollar General, moved to Ms. Pokrifka's store to assist her. (Def.'s SMF, at ¶ 31.) Ms. Pokrifka worked with Mr. Swire for a while and then left on vacation. (Def.'s SMF, at ¶ 32.) Mr. Swire managed the store while Ms. Pokrifka was on vacation.

On August 14, 2003, Sally Vaga-Penarete and Dollar General employee Melissa Owens reported that Ms. Pokrifka used profanity in front of an elderly customer. (Def.'s SMF, ¶ 35.) When Mr. Booth spoke to her about the reports, Ms. Pokrifka denied using profanity. (Booth Decl., Dkt. Entry 28, at ¶ 8.)

Dollar General has policies in place that prohibit the use of profanity in the workplace. (Booth Decl., Dkt. Entry 28, at ¶ 5.)  Ms. Pokrifka received a handbook stating Dollar General's policy regarding profanity (Def.'s SMF, at ¶ 37), and knew that Dollar General maintained a zero-tolerance policy for the use of profanity in the presence of store customers, and that cursing in the store could result in termination.[4]  (Def.'s SMF, at ¶ 38.)

Mr. Booth obtained written statements from witnesses confirming that Ms. Pokrifka used profanity in the store.  (Booth Decl., Dkt. Entry 28, at ¶ 7.)  Sally Vega-Penarete wrote on a note that Ms. Pokrifka repeatedly used profane language around customers.  (Penarete Note, Dkt. Entry 29-8, at 1.)    Melissa Owens wrote on a note dated August 14, 2003, that she heard Ms. Pokrifka use vulgarity in front of customers.  (Owens Note, Dkt. Entry 29-10, at 3.)  Mr. Booth said he did know of any other Dollar Store Manager using profanity in the store in front of customers.  (Booth Decl., Dkt. Entry 28, at ¶ 11.)  Mr. Booth stated he spoke to Field Employee Relations coach Roger Prewitt regarding the incident, and with Mr. Prewitt's concurrence, decided to terminate Ms. Pokrifka's employment.  (Booth Decl., Dkt. Entry 28, at ¶ 9.)

On August 21, 2003, Ms. Pokrifka was terminated, and Mr. Swire became the new Store Manager.  (Def.'s SMF, at ¶¶ 34 & 44.)  Dale Swire, the district manager who replaced Ms. Pokrifka, also reported to Mr. Booth.  (Booth Decl., Dkt. Entry 28, at ¶ 4.)

---

[4]Dollar General's handbook contains a disclaimer providing that employment at Dollar General is at will.  (Def.'s SMF, at ¶ 39.)

Ms. Pokrifka believes that, because she was replaced by a male, she was discriminated against based on her sex.  (Pokrifka Dep., Dkt. Entry 29-2, at 63.)  This is her reason for bringing a gender discrimination claim.  (Id.)   With respect to her medical condition in the work place, Ms. Pokrifka testified that no one ever mentioned her medical condition and that she did not think Mr. Booth would discriminate against her based on her medical condition.  (Id. at 66.) She stated:

> When he came to be area manager, he was the fifth one I had and one that I felt comfortable with – you know, that things are going to be looking up from here. He understood.  He tried to do what he could do.  He was – common sense.  He gave you the time of day.  He listened to you.  He couldn't give you everything that you asked for, but he worked with me.  He was real good.

(Pokrifka Dep., Dkt. Entry 29-2, at 67.)  Nor does she believe that Dale Swirer, Roger Prewitt, Sally Vega-Penarete, or Melissa Owens would discriminate against her based on her medical condition.  (Def.'s SMF, at ¶ 50.)

Ms. Pokrifka claims that she repeatedly asked for help when Bonnie Bolton was out, but did not receive it.  (Pokrifka Dep., Dkt. Entry 29-2, at 65.)  She believed Dollar General was "fed up with [her] asking."  (Id.)

II.  DISCUSSION

A.  Standard of Review

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

10

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.  Americans with Disabilities Act Claim[5]

The ADA forbids discrimination "against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment."[6]  42 U.S.C. § 12112(a).  A "qualified individual with a disability" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

Plaintiff bears the initial burden of establishing that she: "(1) . . . is a disabled person within the meaning of the ADA; (2) . . . is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) . . . has suffered an otherwise adverse employment decision as a result of discrimination."  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir.1999) (citing Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir.1998)).  Once the plaintiff demonstrates a prima facie case of discrimination, the burden shifts to the employer to show some legitimate, nondiscriminatory

---

[5]In her brief in opposition, Ms. Pokrifka only opposes summary adjudication of her discrimination claim under the ADA.  Accordingly, Dollar General's Motion for Summary Judgment as to Ms. Pokrifka's other claims is deemed unopposed, and summary judgment will be entered in favor of Dollar General as to those claims.  See Hoffman v. Bankers Trust Co., 925 F. Supp. 315 (M.D. Pa. 1995) (deeming claims not addressed in Plaintiff's opposition brief abandoned, thus warranting summary judgment in favor of Defendant).

[6]Employer liability under the PHRA follows the standards set out for employer liability under the ADA.  Williams v. Phila. Housing Authority Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004); Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); see also Thursby v. City of Scranton, No. 3:CV-02-2355, 2006 WL 1455736, at *3 (M.D. Pa. May 25, 2006).

reason for the employment action.[7] Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir.1996). If the employer can make this showing, the burden shifts back to the plaintiff to demonstrate that the asserted reason for the decision was a pretext for discrimination. Id. at 951-52; Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Plaintiff's invocation of the ADA and PHRA fails on the first element of the prima facie case: the evidence is such that no rational trier-of-fact could find that she is disabled within the meaning of the statutory definition of "disability." A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[8] 42 U.S.C. § 12102(1). Major life activities "are those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. App. 1630.2(i). The ADA provides a non-exhaustive list of major life activities, which includes: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Ms. Pokrifka claims her back injury is a physical impairment substantially limiting her

---

[7]Because Ms. Pokrifka attempts to prove her claim through circumstantial evidence, the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is implicated.

[8]Ms. Pokrifka does not assert she is disabled under subsections (B) or (C).

ability to sleep for more than five to six hours at a time and her ability to lift.[9] (Pl.'s Br. Opp'n Mot. Summ. J., Dkt. Entry 33, at 7.) Dollar General does not dispute that sleeping and lifting are major life activities as defined by the ADA, but argues Ms. Pokrifka is not substantially limited in those activities.

A plaintiff, of course, shoulders the burden of presenting evidence that the extent of the limitations resulting from her condition, in terms of her own experience, are substantial. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999). Indeed, "she must affirmatively point to evidence in the record that establishes that she is substantially limited in a major life activity in order to survive a motion for summary judgment." Meyers v. Conshohocken Catholic School, No. Civ. A. 03-4693, 2004 WL 3037945, at *6 (E.D. Pa. Dec. 30, 2004). In Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002), the United States Supreme Court observed that "[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." See 42 U.S.C. § 12102(2)(A). Our Court of Appeals has "held only extremely limiting disabilities – in either the short or long-term – . . . qualify for protected status under the ADA." Marinelli v. City

---

[9]In addition, Ms. Pokrifka claims her purported back injury has limited her in performing the following activities: riding amusement park rides, roughhousing with her nephew, walking for longer than forty-five minutes and standing for more than twenty minutes. Dollar General contends that riding amusement park rides is not a major life activity. As to the other activities, Dollar General claims Mr. Pokrifka was not substantially limited. (Br. Supp. Mot. Summ. J., Dkt. Entry 26, at 16-17.) Ms. Pokrifka only opposes Dollar General's arguments as to her ability to lift and sleep. (Br. Opp'n Mot. Summ. J., Dkt. Entry 33, 7-9.)

of Erie, 216 F.3d 354, 362 (3d Cir. 2000).[10] Determinations as to the existence of a disability should be made on a case-by-case basis. See Toyota, 534 U.S. at 198 ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").[11]

---

[10]Pertinent factors to consider in determining whether an individual is substantially limited in a major life activity include:

(i) The nature and severity of the impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j). An impairment "substantially limits" a person if it makes the person:

(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner, or duration under which [the person] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j).

[11]As explained by the Equal Employment Opportunity Commission ("EEOC"):

The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.

In *Marinelli v. City of Erie, Pa.*, 216 F.3d 354 (3d Cir. 2000), our Court of Appeals ruled that, as a matter of law, a medical restriction that the plaintiff was unable to do any "heavy work greater than ten pounds" did not represent a substantial impairment of either the major life activity of lifting or the major life activity of working. The court reasoned that "Marinelli's lifting restriction does not render him sufficiently different from the general population such that he is substantially limited in his ability to lift." Id. at 364.

Other Courts of Appeals have recognized similar lifting restrictions as not substantially limiting under the ADA. In *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 540 (9th Cir. 1997), the court concluded that the plaintiff's restrictions from lifting more than 25 pounds on a continuous basis, more than 50 pounds twice a day, and more than 100 pounds once a day, were not substantially limiting, explaining:

> In assessing whether Thompson is [substantially] limited, we are in territory
> well-charted by our colleagues in other circuits. A number of courts have held
> that lifting restrictions similar to Thompson's are not substantially limiting, and we
> agree. See Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349
> (4th Cir. 1996) (declaring, as a matter of law, that a 25-pound lifting limitation
> "does not constitute a significant restriction on one's ability to lift, work, or perform
> any other major life activity"), cert. denied, 520 U.S. 1240 (1997); see also Aucutt
> v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir. 1996) (holding
> that a 25-pound lifting restriction did not substantially limit any major life
> activities); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996) (concluding,
> where a plaintiff could lift and reach as long as he avoided heavy lifting, that he
> was not substantially impaired).

---

29 C.F.R. App. 1630.2(j).

Id. at 540.

Here, the evidence of record is insufficient to show that Ms. Pokrifka was substantially limited in the major life activity of lifting. Approximately six months after her fourth workplace injury, in November of 2002, Dr. Kline noted that Ms. Pokrifka was working full-time. In a Functional Capacity Evaluation in January of 2003, Dr. Kline found she "is minimally capable of performing functional activities at the light-medium physical demand level," but also thought "it is more likely that Ms. Pokrifka would be capable of performing at a higher physical demand level . . . ." (Dkt. Entry 29-6.) A few months later, upon examination, Dr. Kline found that Ms. Pokrifka could sit, stand, or walk for six to eight hours. (Dkt. Entry 29-5, at 1.) He found she could lift from 21 to 30 pounds and could occasionally bend, reach, climb, squat, rotate, twist, and kneel. (Id.) Finally, in November of 2003, Dr. Prebola observed that Ms. Pokrifka could lift and carry 35-45 pounds occasionally, and occasionally push or pull 75 pounds. (Id.) He even allowed her to work full-time and overtime hours.[12] Clearly, the evidence of record compels a determination that Plaintiff is unable to show that she is substantially limited in lifting. See Smith v. ABF Freight Systems Inc., Civil Action No. 1:04-CV-2231, 2007 WL 3231969 (M.D. Pa. Oct. 29, 2007) (finding that plaintiff's restriction of lifting up to twenty pounds insufficient to

---

[12]Dr. Michael and Dr. Kline wrote to Ms. Pokrifka's attorney, opining that her back injures will most likely be permanent. Even if her injuries are permanent, the fact that she is able to lift up to thirty pounds and can bend, reach, climb, squat, rotate, twist and kneel preclude a finding that she is substantially impaired in any major life activity.

constitute a substantial limitation in the major life activity of lifting).

As to the life activity of sleeping, Ms. Pokrifka testified that she had a "bad sleeping arrangement." (Pokrifka Dep., Dkt. Entry 29-2, at 37.) She stated: "I toss and turn. I'm up. My arms are numb. My legs are numb. My back is sore. Sometimes it's like to a point where it feels back and blue . . . My sleeping is no good." (Id. at 38.) She further testified she generally goes to bed between 11:00 and 11:30 p.m., and wakes up at 6:45 a.m., and is able to sleep from five to six hours a night. (Id.) She also finds time during the day to take an hour, or hour and a half, nap. (Id.)

Sleeping six hours a night with a nap during the day is not indicative of a severe affliction with substantial limitations. See Sloan v. City of Pittsburgh, 110 F. App'x 207, 212 (3d Cir. 2004) ("Difficulty sleeping is . . . not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction . . . ."); Smyth v. Wawa, Inc., Civil Action No. 06-4474, 2008 WL 741036, at *12 (E.D. Pa. Mar. 19, 2008) (listing Courts of Appeals that have held an employee who could sleep no more than four to six hours a night not substantially limited in the major life activity of sleeping). Ms. Pokrifka's testimony does not reflect an inability to sleep, but poor sleep patterns, which is a common sleeping dilemma encountered by the average person, and not sufficient to create a genuine issue of material fact.[13] See Maslanka v.

_____

[13]The fact that Ms. Pokrifka only mentioned her sleeping issue to her chiropractor, and not to any other doctor treating her condition, belies a finding that she is substantially limited in the major life activity of sleeping.

Johnson & Johnson, Inc., Civil Action No. 04-CV-5477(FLW), 2008 WL 918499, at *14 (D.N.J. Mar. 31, 2008) (concluding the plaintiff's testimony that he went three nights without sleeping and letters from physicians stating that the plaintiff suffers from poor sleep patterns not sufficient evidence of a substantial limitation in sleeping under the ADA).

In the event that an individual is not found substantially limited in a major life activity, a court is to inquire into whether an individual is substantially limited in the major life activity of working. 29 C.F.R. App. 1630.2(j); Marinelli, 216 F.3d at 364. To be substantially limited in the activity of working means to be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job [, however,] does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). "Both the EEOC and the courts therefore have required a plaintiff to show that his or her impairment prevents them from engaging in a category of jobs." Marinelli, 216 F.3d at 364 (emphasis added).

Evidence of the minimal work restrictions placed on her by her doctor merely establish Ms. Pokrifka is limited in performing a narrow range of jobs, and not "a category of jobs" as required. See Marinelli, 216 F.3d at 365 ("Marinelli cannot avoid judgment as a matter of law simply by pointing to the restrictions that [his doctor] placed upon his work."); Sloan, 110 F.

19

App'x at 212 ("Plaintiffs must allege they are unable to perform in a broad class of jobs.");

Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644 (2d Cir. 1998) (plaintiff's limitations at work did not significantly restrict his ability to perform either a class of jobs or a broad range of jobs, but disqualified him from only a narrow range of jobs). Ms. Pokrifka has not tendered evidence that she is unable to perform in a broad category of jobs. In fact, she currently maintains employment as a clerk in the Luzerne County Courthouse, and previously worked as a bartender and waitress. (Pokrifka Dep., Dkt. Entry 29-2, at 5.) Under these circumstances, a reasonable jury could not conclude that Ms. Pokrifka is impaired from performing a class of jobs or a broad range of jobs in various classes. See Smith, 2007 WL 3231969, at *6; Parker v. City of Williamsport, 406 F. Supp. 2d 534, 546-547 (M.D. Pa. 2005) (finding that the plaintiff was not substantially impaired in the major life of activity of working because he presented no evidence of his "work-related abilities and qualifications, the jobs available in his geographic area, the number of jobs utilizing his particular abilities and the number of those jobs from which he is disqualified due to his impairments ( i.e., he is restricted from a class of jobs), or the number of jobs that do not utilize his particular abilities and the number of those jobs from which he is disqualified due to his impairments ( i.e., he is restricted from a broad range of jobs in various classes).").[14]

---

[14]The duty to accommodate arises only if the employee is determined to be disabled under the ADA. Caracciolo v. Bell Atlantic-Pennsylvania, 135 F. App'x 503, 506 (3d Cir. 2005) (citing Buskirk v. Apollo Metals, 307 F.3d 160, 169 n.2 (3d. Cir. 2002). Hence, because Ms.

## III.  CONCLUSION

For the foregoing reasons, Dollar General's Motion for Summary Judgment will be granted.[15]  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

_____

Pokrifka tendered insufficient evidence of a disability under the ADA, any contention that Dollar General failed to reasonably accommodate her is inapposite.

[15]Because consideration of Dr. Michael's report does not alter the conclusions reached in granting the summary judgment motion, the Motion to Strike his report (Dkt. Entry 30) will be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SARAH MARIE POKRIFKA,          :
                    Plaintiff   :
                                :
     v.                         :          3:CV-06-1759
                                :          (JUDGE VANASKIE)
DOLLAR GENERAL CORPORATION,     :
                    Defendant   :

ORDER

NOW, THIS 14th DAY OF SEPTEMBER, 2009, for the reasons set forth in the above

memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Dkt. Entry 25) is GRANTED.  Judgment

shall be entered in favor of Defendant and against Plaintiff.

2. Defendant's Motion to Strike the testimony of Dr. Joseph Michael from the summary

judgment record (Dkt. Entry 30) is DENIED.

3. The Clerk of Court is directed to mark this matter CLOSED.

                              s/ Thomas I. Vanaskie
                              Thomas I. Vanaskie
                              United States District Judge